UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FERNANDO DE LA GARZA,

Plaintiff,

-against-

CENTENE MANAGEMENT COMPANY LLC,
and RYAN GOODENOUGH, individually,

Defendants.

**AMENDED
COMPLAINT**

Civil Case No.:

1:26-cv-01142-EK-SDE

**JURY TRIAL
DEMANDED**

Plaintiff Fernando De La Garza ("Plaintiff"), by and through his attorneys, STEVENSON MARINO LLP, as and for his Amended Complaint against Centene Management Company LLC ("Centene"), and Ryan Goodenough, individually ("Goodenough") (collectively, as "Defendants"), alleges upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

**NATURE OF THE CASE**

1. This is a civil action for damages and equitable relief based upon the willful violations that Defendants committed of Plaintiff's rights guaranteed to him by: (i) the anti-discrimination and anti-retaliation provisions of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), based on sex and sexual orientation; (ii) the anti-disability discrimination, failure to accommodate, and anti-retaliation provisions of Title I of the Americans with Disabilities Act of 1990, as amended ("ADA"); (iii) the anti-interference and anti-retaliation provisions of the Family and Medical Leave Act ("FMLA"); (iv) the anti-discrimination and anti-retaliation provisions of the New York State Human Rights Law ("NYSHRL"), based on sex, sexual orientation, disability, and race; (v) the anti-discrimination and anti-retaliation provisions of the

New York City Human Rights Law ("NYCHRL"), based on sex, sexual orientation, disability, and race; and (vi) any other violations that can be inferred from the facts set forth herein.

## PRELIMINARY STATEMENT

2.      This action arises from Defendants' discrimination, hostile work environment, retaliation, interference with protected leave, failure to accommodate, failure to engage in a good-faith interactive process and/or cooperative dialogue, and termination of Plaintiff's employment.

3.      Plaintiff worked for Defendants in various roles from 2018 until his termination in 2024, supporting Defendant Centene's New York market, which operated under the Fidelis Care brand.

4.      Although Plaintiff worked remotely during portions of his employment, including while residing in Texas and Florida, Plaintiff's role was tied to, and Plaintiff regularly traveled to, and worked in, New York.

5.      Defendants' unlawful conduct deprived Plaintiff of his New York-centered position and prevented him from continuing to perform work for and in Centene's New York market.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.      On or about April 2, 2025, Plaintiff filed a Charge of Discrimination ("Charge") with the United States Equal Employment Opportunity Commission ("EEOC"), EEOC Charge No. 520-2025-04392, against Centene based on sex discrimination, sexual orientation discrimination, disability discrimination, and retaliation in violation of, *inter alia*, Title VII and the ADA.

7.      On January 13, 2026, the EEOC issued Plaintiff a "Notice of Right to Sue."

8.      Plaintiff has commenced this action within ninety days of receipt of that notice from the EEOC.

**JURISDICTION AND VENUE**

9. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under Title VII, the ADA, and the FMLA.

10. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's NYSHRL and NYCHRL claims because those claims arise from the same facts, employment relationship, adverse actions, and course of discriminatory and retaliatory conduct as Plaintiff's federal claims.

11. Venue is proper in this District because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and in New York State, including Plaintiff's reporting relationship to Centene's Long Island City, New York office, the New York-centered work Plaintiff performed, the New York operations affected by Defendants' conduct, the New York-based or New York-connected decision-makers and witnesses involved in the relevant events, and Plaintiff's work-related travel to New York.

12. Plaintiff reported to and supported Centene's Queens, New York-centered operations and worked with leaders, employees, and business operations connected to New York.

13. Plaintiff's work affected New York members, New York patients, New York providers, New York community-based offices, New York leadership, and Centene's ability to meet New York State and federal requirements for its New York plan.

14. Plaintiff traveled to New York frequently throughout his employment, including multiple times each year during his tenure, and his travel was for work for Centene's New York market, supporting New York leadership, New York operations, and New York business needs.

15. Plaintiff's New York travel including extended trips that lasted multiple weeks or approximately a month or more.

16. Plaintiff suffered and experienced discrimination and retaliation while physically present in New York while working at Centene.

17. For example, during the period when Goodenough was transitioning into his position in late 2023, Plaintiff spent approximately two months traveling between New York City, Albany, and Saratoga Springs for work.

18. Plaintiff's last trip to New York before his termination occurred during the last week of July 2024, shortly after his forced premature return from medical leave and while he was still subject to Defendants' heightened scrutiny and newly imposed workload.

19. The July 2024 New York trip was for a Community Based Offices tour in New York City related to Customer Experience and Quality Improvement.

20. That Community Based Offices tour was connected to Plaintiff's work for Centene's New York market and related to how Centene/Fidelis interacted with and served its New York members and communities. During this trip, Plaintiff interviewed Fidelis employees in each of the community offices to review strengths and needs for each location from an employee standpoint.

21. While working remotely from Texas until the end of August 2024, and from Florida thereafter until his termination, Plaintiff continued to perform work directed at New York, and his remote location did not change the New York-centered nature of his job.

22. Defendants' key decision-makers are located in or connected to New York.

23. No key decision-makers or witnesses to the conduct alleged herein were based in Texas.

24. Dr. Vincent Marchello, Centene's Chief Medical Officer, was based in New York City and has knowledge regarding New York leadership, New York operations, Plaintiff's role, Plaintiff's performance, and the New York-centered nature of Plaintiff's work.

25. Tom Halloran, Centene's Chief Executive Officer, was based in New York City and has knowledge regarding New York executive leadership, reporting structure, and New York-based operations.

26. Goodenough, Plaintiff's supervisor, was based in New York and has knowledge regarding Plaintiff's performance, medical leave, accommodation and return-to-work process, the warning Plaintiff received, and the decision-making process that led to Plaintiff's termination.

27. Defendant Goodenough, along with Human Resources representatives involved in Plaintiff's leave, accommodation, warning, and termination were based in New York or outside Texas, not in Texas or Florida.

**PARTIES**

28. Plaintiff Fernando De La Garza is a homosexual male and person with a disability, including chronic depression and anxiety.

29. Plaintiff worked for Centene and its predecessor, WellCare/Fidelis Care, beginning in or around November 2018 until his termination on January 6, 2025.

30. Defendant Centene Management Company LLC is a foreign limited liability company organized under the laws of Wisconsin, with a facility located at 25-01 Jackson Avenue, Long Island City, New York 11101.

31. Centene is a wholly owned subsidiary of Centene Corporation and provides corporate and administrative services to Centene's health-plan operations.

32.     Defendant Goodenough is an individual who lives and works in New York, and, beginning in October 2023, served as Vice President, Quality & Process Improvement, and became Plaintiff's direct supervisor.

33.     Goodenough had and exercised supervisory authority over Plaintiff, participated in decisions affecting Plaintiff's job duties, leave, accommodation, return-to-work process, workload, scrutiny, warnings, performance treatment, and termination, and is individually liable under all statutes permitting individual liability.

## BACKGROUND FACTS

### Plaintiff's New York-Centered Role and Performance Record

34.     In November 2018, Plaintiff began his employment with Centene's predecessor, WellCare, as Manager and Acting Director of Quality Improvement.

35.     Around 2020, Centene acquired WellCare and merged it into Fidelis Care, and Plaintiff was promoted to Director upon completion of the merger.

36.     Plaintiff's responsibilities included managing and supporting important New York State Performance Improvement Program work that affected Centene's government funding, regulatory standing, and ability to maintain successful operations in New York, such as overseeing NCQA Accreditation and State Regulatory Reporting for health-plan operations connected to the Fidelis Care brand.

37.     Prior to the merger with Fidelis, as Plaintiff joined Defendants, Defendant's New York plan was given a provisional accreditation status, as several of the reports and findings were inaccurate or incomplete.

38. Under Plaintiff's leadership, the plan achieved full accreditation with no adverse findings or comments, and Plaintiff's team achieved successful accreditation survey results in later years with no adverse findings or comments.

39. State authorities were impressed with Plaintiff's team's work, and the practices developed by Plaintiff's team became standards for how other providers should model their New York State Performance Improvement Programs.

40. Plaintiff's work was not abstractly or tangentially related to New York; it was directed at New York operations and had a direct effect on Centene's New York business, regulatory performance, and services provided to New York members and providers.

41. Plaintiff never received any Performance Improvement Plan or documented coaching or discipline throughout his tenure and had more than six years of consistently positive evaluations before the events leading to this lawsuit.

### *Goodenough's Arrival and Discriminatory Hostile Work Environment*

42. In October 2023, the workplace environment changed following the departures of Vice President Deborah Chambers and Senior Director Sally Hinkle.

43. Defendant Goodenough was promoted to Vice President of Quality & Process Improvement and became Plaintiff's direct supervisor on October 19, 2023.

44. Shortly after becoming Plaintiff's supervisor, Goodenough began targeting Plaintiff through discriminatory conduct because Plaintiff is a gay male of Mexican-American descent, including publicly reprimanding Plaintiff and undermining his authority in emails to other directors.

45. Goodenough openly favored and spent more time with heterosexual and Caucasian employees while excluding Plaintiff and another homosexual minority colleague whenever

Plaintiff was physically present in New York while performing his job duties, as well as whenever Plaintiff was attending meetings or phone calls virtually while working remotely.

46. In January 2024, Goodenough accused Plaintiff of failing to complete accreditation submission components on time, even though those responsibilities were shared across multiple divisions and overseen by Afsar Shamsi, who reported directly to Goodenough.

47. The New Member Survey was ultimately delivered timely and accurately, contributing to what was projected to be another perfect NCQA Accreditation Survey.

48. During that January 2024 meeting, Shamsi had expressed to Plaintiff that he was new to the position and that he had been given little to no guidance on how to initiate the project or how to administer it; he was simply told to do it by Goodenough.

49. Plaintiff was never made aware that the project existed or that Shamsi was leading it until he received Goodenough's email reprimanding him.

50. At the time, Plaintiff stepped in to assist Shamsi with completion of the New Member Survey, even though Shamsi reported to Goodenough rather than Plaintiff.

51. On or around February 14, 2024, Plaintiff was physically present in New York City for work at the Fidelis office on Jackson Avenue in Long Island City, Queens. Plaintiff was in New York City for an in-person engagement with his team at the Fidelis office on Jackson Avenue in Long Island City, Queens.

52. During that New York City work visit, Plaintiff attended and participated in a meeting involving Dylan Brown, Javeeria Ghani, Mon McIntyre, and Defendant Goodenough concerning a Performance Improvement Program required by the New York State Department of Health.

53.     Dylan Brown was a seasoned subject-matter expert regarding PIPs and had developed interventions for the performance plan that Plaintiff understood satisfied the State's requirements, were consistent with interventions used across the market, and would satisfy regulatory requirements without negatively affecting ratings or reimbursement.

54.     Mon McIntyre and Goodenough nevertheless challenged the interventions as insufficient and demanded additional goals or progress, which Plaintiff experienced as unnecessary scrutiny and part of a broader pattern of unusually intense scrutiny of Plaintiff and his team.

55.     After Goodenough left the meeting, Mon McIntyre and Maria Bonadillio became extremely confrontational toward Dylan Brown, including raising their voices and yelling at him, while Dylan and Javeeria remained professional.

56.     Plaintiff intervened to de-escalate the meeting and explained Plaintiff's position from the standpoint of New York State regulatory requirements and why the proposed interventions were sufficient.

57.     While Plaintiff was still physically present and working in New York, Goodenough sent Plaintiff an email reprimanding him, expressing disappointment that Plaintiff had not spoken enough during the meeting, criticizing Plaintiff's leadership, and holding Plaintiff responsible for what Goodenough characterized as Dylan Brown's unprofessional behavior.

58.     Goodenough's reprimand amounted to a discriminatory and unjustified blaming of Plaintiff, as Goodenough's claims were baseless and unfair because Goodenough had left approximately halfway through the meeting and did not witness the portion when the situation escalated, Plaintiff intervened, and Dylan remained professional while others became confrontational.

59. Dylan Brown and Javeeria Ghani later filed complaints concerning the meeting, and Plaintiff raised and/or filed the matter with Corporate Human Resources.

60. During the same New York City work visit, Goodenough sent Plaintiff another highly critical email stating that other leaders had expressed concerns that Plaintiff lacked subject-matter knowledge regarding the MLTC program, without identifying those leaders or providing specific supporting examples, designed to intimidate Plaintiff and demonstrated further Goodenough's discriminatory animus toward Plaintiff.

61. At the time of Goodenough's MLTC criticism, Plaintiff was actively working on improving MLTC metrics and performance scores.

62. While still in New York, Plaintiff contacted Mary Lou Matamoros, the Director overseeing the MLTC program, to understand the basis for Goodenough's criticism, and Matamoros stated that Goodenough's email was "uncalled for" and that she could not understand why someone would say that about Plaintiff because Plaintiff was well-versed in the MLTC Program Metric and understood the struggles and interventions that could increase scores.

63. Again, while still physically present in New York, Plaintiff then discussed the issue with Goodenough one-on-one, and Goodenough changed his assessment substantially, telling Plaintiff that he had "all gears engaged" and acknowledging in substance that Plaintiff knew what he was talking about.

64. This became a pattern: Goodenough issued strongly worded in-person, verbal, and written criticism questioning Plaintiff's performance or competence in front of his peers and subordinates to humiliate and intimidate Plaintiff, but when Plaintiff met with Goodenough privately and discussed the substance, Goodenough retreated from or contradicted the criticism, only to later send another critical email.

65. During the same New York City work visit, Plaintiff also experienced heightened scrutiny from Goodenough in connection with presentations, including limited guidance, numerous comments and requested changes, additional rounds of revisions, and shifting expectations that made it difficult for Plaintiff to know what would satisfy Goodenough.

66. Still during the same New York City work visit, Goodenough threatened to transfer Plaintiff's NCQA Accreditation oversight responsibilities to Corporate and transferring Plaintiff's State Regulatory Reporting oversight responsibilities to another Director, which were significant components of Plaintiff's position and amounted to overt adverse actions.

67. Based on the escalating criticism, heightened scrutiny, shifting expectations, questioning of Plaintiff's competence, and discussion of removing significant responsibilities while Plaintiff was physically working in New York, Goodenough was targeting and harassing him.

68. Rather than accepting Plaintiff's constructive feedback, Goodenough intensified his scrutiny of Plaintiff, subjected him to relentless criticism, and repeatedly asserted that Plaintiff's work needed improvement without providing specific, actionable guidance.

69. Goodenough's hostile environment was severe enough that Dylan Brown, heterosexual colleague and subordinate, accepted a lateral position outside the department to avoid working under Goodenough's leadership.

70. Goodenough accused Plaintiff of failing to manage Dylan Brown, claiming Brown's performance was so poor due to Plaintiff's supervision that it affected the department.

71. But despite Goodenough's apparent criticism of Brown directed at Plaintiff, after Plaintiff went on leave, Centene offered Brown a raise and promotion, including a $10,000

compensation increase to remain under Goodenough, contradicting Goodenough's criticism of Plaintiff's supervision.

***Medical Diagnosis, Protected Activity, and FMLA Leave***

72. During Plaintiff's February 14, 2024, travel to New York City where he experienced worsening treatment at the hands of Defendant Goodenough, Plaintiff attended an annual wellness visit in New York City with his primary care physician.

73. During that visit, despite not planning to address mental health concerns, Plaintiff's physician happened to notice indicators during the visit that were hallmark symptoms of depression and anxiety, which led him to conduct a mental health screening.

74. Plaintiff's physician referred him to a therapist, and Plaintiff began therapy in early March 2024 based on the discriminatory and hostile treatment Defendant Goodenough had directed at Plaintiff.

75. Merely five days later, on February 19, 2024, Goodenough continued his discriminatory hostile work environment and mistreatment of Plaintiff by contacting Centene's People Relations team regarding Plaintiff's performance, falsely citing missed deadlines and lack of responsiveness.

76. Around late February 2024, Plaintiff participated in a meeting that devolved into an aggressive and hostile exchange under Goodenough's leadership, with Director Mon McIntyre and Maria Biondilillo participating.

77. In late February 2024, Plaintiff reported concerns to Human Resources regarding hostile work environment, discrimination, retaliation, and the conduct of Goodenough and others.

78. Plaintiff also forwarded the complaints submitted by Brown and Ghani to Human Resources.

79. HR offered no meaningful support and dismissed Plaintiff's concerns by claiming the department lacked authority to take actionable steps.

80. On or about February 20, 2024, Plaintiff notified Goodenough that he had filed a claim for short-term disability following a recent healthcare visit and that he would be out of the office while awaiting instructions from Lincoln Financial regarding his leave.

81. Plaintiff commenced FMLA leave on February 21, 2024, which was approved through August 2024.

82. Plaintiff took approved medical leave for his mental health condition, his providers later supported continued leave, and Plaintiff understood his medical leave was authorized through August 2024.

### *Department Reorganization and Forced Premature Return*

83. Plaintiff directly notified Goodenough that he had filed a short-term disability claim and would be out of the office while awaiting instructions regarding his leave. Goodenough therefore knew that Plaintiff was invoking medical leave rights and that Plaintiff's absence related to a serious health condition.

84. Despite that knowledge, Goodenough contacted People Relations regarding Plaintiff's alleged performance, participated in communications with Human Resources concerning the alleged impact of Plaintiff's continued leave, and participated in and/or influenced the decision-making process that resulted in Plaintiff being forced to return to work before his treatment team recommended.

85. Goodenough's involvement was not passive or merely administrative. Goodenough was the supervisor who managed Plaintiff's work, assessed Plaintiff's performance, communicated alleged performance concerns to People Relations, and then supervised and caused

Plaintiff's return into a materially different role with new responsibilities, a new team, and new expectations.

86. Goodenough's control over Plaintiff's FMLA rights is further demonstrated by the fact that, while Plaintiff was on medical leave, Goodenough executed or participated in a department reorganization that eliminated or substantially changed Plaintiff's prior position.

87. As a result, when Plaintiff returned from leave, Plaintiff was not restored to the same or an equivalent position, but instead was placed into a newly created Director of Customer Experience role with a different team, new subject matter, new responsibilities, new expectations, and a changed reporting structure.

88. NCQA Regulatory Reporting Responsibilities were at that time reporting directly to Goodenough; however, a few months later Goodenough moved them back over to Plaintiff, thus increasing his work responsibilities despite Plaintiff's ongoing mental health needs.

89. Goodenough also controlled other of Plaintiff's post-leave working conditions by criticizing Plaintiff's performance only nine business days after Plaintiff returned from leave, even though Plaintiff remained in a transition period, was working under an approved ADA ramp-up schedule, had been reassigned to a new role, and had been given new responsibilities and expectations.

90. Goodenough's control over Plaintiff's employment continued through termination. Goodenough provided inconsistent performance feedback, including August 2024 written praise stating that Plaintiff was doing an "excellent job," later opened or caused additional People Relations escalation, told Plaintiff on January 3, 2025 that Plaintiff was "not the right fit" despite Goodenough personally placing Plaintiff *in that very role* upon his return from leave, participated

14

in the January 6, 2025 termination meeting, and sent communications attempting to justify the termination.

91. While Plaintiff was on medical leave, Goodenough personally executed a complete departmental reorganization affecting over fifty employees without consulting or notifying Plaintiff.

92. The reorganization included several changes to leadership positions and the elimination of the Director of Quality Improvement position held by Plaintiff.

93. The reorganization created a new position, Director of Customer Experience, focused on improving CAHPS scores, which had decreased in 2023 and put $250 million in reimbursement at risk.

94. On May 30, 2024, Goodenough informed Human Resources about the impact of Plaintiff's continued leave on department performance.

95. On June 17, 2024, Centene issued an "undue hardship" determination asserting that CAHPS scores were not improving without a dedicated leader.

96. On June 18, 2024, at Goodenough's direction, Plaintiff was advised that he would need to return to work on July 1, 2024, with or without accommodation, or face administrative separation.

97. Plaintiff was told he had to return to work on July 1, 2024 or face separation, even though his treatment team had not recommended that he return at that time.

98. Approximately one week before his return when speaking with the accommodations team, Plaintiff stated that he did not feel as though he was ready to return to work but that he could not lose his job and thus felt as though he did not have a choice but to return prematurely.

99. As a result, Plaintiff returned to work earlier than his treatment team recommended because he faced the choice of returning or losing his job.

100. Plaintiff returned to work on July 1, 2024 with an approved temporary accommodation of a reduced work schedule through July 26, 2024.

101. When Plaintiff returned, because of Goodenough's department restructure, he did not return to the same role, team, responsibilities, or reporting structure he had before his leave.

102. Plaintiff returned to the newly created Director of Customer Experience role, with a different team, new subject matter, new responsibilities, and new expectations.

103. That new Director of Customer Experience role remained tied to Centene's New York market and New York operations and was not a Texas role, and Plaintiff continued to report to Goodenough in this new role.

104. Despite Plaintiff's approved phased return or ADA ramp-up schedule, Goodenough required Plaintiff to immediately start back up with a full workload and additional expectations, rendering the ramp-up schedule ineffective as a meaningful accommodation.

105. Making matters worse, Goodenough declined and refused to assign anyone to fill in for Plaintiff's work while he was on leave, as Plaintiff's emails from his three-month absence remained unopened and unread upon his return, creating a significant backlog.

106. Despite Plaintiff's ADA ramp-up schedule, Defendants immediately burdened Plaintiff with a full-time workload, causing him to work many nights until midnight or later.

107. Goodenough was directly involved in the issues surrounding Plaintiff's return from leave, Plaintiff's ramp-up schedule, the warning Plaintiff received, and Plaintiff's termination. Plaintiff understood Goodenough to be directly involved in his return from leave, ramp-up schedule, warning, and termination.

16

108. Based on Plaintiff's interactions and the communications he received, Goodenough was one of the key people driving or implementing the decisions affecting Plaintiff's return from leave, accommodation, warning, and termination.

109. Indeed, before, during, and after his leave, Goodenough was and remained Plaintiff's direct supervisor and had knowledge of Plaintiff's medical leave, return-to-work restrictions, ADA ramp-up schedule, reassignment, performance, and the decision to terminate his employment.

### *New York Work and New York Impact During the Post-Leave Period*

110. Plaintiff's July 2024 forced return occurred into a New York-centered role tied to Centene's New York market and New York operations.

111. Only a few business days after Plaintiff returned from leave, Goodenough sent Plaintiff an email criticizing his performance.

112. On July 18, 2024, Goodenough contacted People Relations regarding continued performance concerns about Plaintiff during the period when Plaintiff was originally supposed to remain on medical leave due to his disability, and during what was supposed to be Plaintiff's ADA ramp-up schedule.

113. On July 19, 2024, Goodenough emailed Plaintiff identifying purported areas for improvement, including leadership skills and serving as a subject matter expert for his staff.

114. Goodenough's July 2024 criticism was yet another discriminatory, unjustified adverse action because Plaintiff had just been involuntarily reassigned to a newly created Director of Customer Experience role, was managing an entirely new team, was unfamiliar with newly assigned subject matter, and was still operating under an approved reduced-schedule accommodation due to his disability.

115. During the last week of July 2024, while Plaintiff was still recovering from his forced premature return and while Goodenough had just criticized his performance, Plaintiff physically traveled to New York City for work for a Community Based Offices tour in New York City related to Customer Experience and Quality Improvement.

116. During that July 2024 New York City trip, Plaintiff performed work connected to the new Director of Customer Experience role into which he had been placed following medical leave.

117. Plaintiff's July 2024 New York City work occurred while Defendants were imposing heightened scrutiny, unrealistic expectations, and increased workload during Plaintiff's post-leave transition and accommodation period.

118. Plaintiff's hostile work environment, retaliation, and disability-related accommodation failures therefore affected Plaintiff while he was physically performing New York-centered work in New York City.

119. After Plaintiff returned from leave and during his July 2024 trip to New York City, Goodenough and Defendants subjected him to increased scrutiny, micromanagement, unrealistic expectations, criticism, and training assignments that substantially increased Plaintiff's workload while he was still transitioning back from medical leave.

120. Continuing the same pattern that occurred before his leave, however, in August 2024, after Plaintiff returned from leave, Goodenough provided private, one-on-one written feedback stating that Plaintiff was doing an "excellent job" and that Plaintiff's performance was noticeably improving.

121. Yet again, Goodenough's August 2024 praise directly contradicted Goodenough's earlier July 2024 performance criticisms that were issued in the presence of Plaintiff's colleagues and/or to human resources, which were later asserted reasons for Plaintiff's termination.

***Mixed Performance Messages and Continued Scrutiny: the "Quality Summit" Incident***

122. Following Plaintiff's return from leave, and after his July 2024 New York trip, Goodenough's discriminatory treatment continued disproportionately targeted Plaintiff and Plaintiff's colleague, both homosexual male minorities, while Goodenough consistently praised other employees, particularly heterosexual and Caucasian employees.

123. Goodenough subsequently demoted Plaintiff's homosexual colleague without providing coaching or a Performance Improvement Plan, demonstrating a pattern of adverse treatment toward employees who shared Plaintiff's sexual orientation.

124. On November 14, 2024, Goodenough announced that a Quality Planning Summit was scheduled for December 11-12, 2024, in Buffalo, New York.

125. Plaintiff had already been approved to be on vacation during that timeframe, with approval more than a year earlier.

126. During a directors' meeting, Plaintiff told Goodenough he would be on vacation during the summit.

127. Initially, Goodenough supported Plaintiff continuing with his planned vacation, requested that Plaintiff develop the presentation for the summit so a team member could present it, and assured Plaintiff that his section would be covered.

128. Plaintiff prepared the presentation and delivered it to Goodenough before his vacation, and worked with Goodenough on edits the evening before his vacation.

129. But yet again, Goodenough switched gears and openly displayed his discriminatory animus. That is, during Plaintiff's vacation, Goodenough contacted Plaintiff about previously unidentified "issues" related to presentations and events occurring in Plaintiff's absence.

130. When Plaintiff offered to address Goodenough's concerns during his vacation, Goodenough instructed Plaintiff to "take his time off" and told him not to worry.

131. Despite his assurances, on December 11, 2024, Goodenough opened another People Relations case against Plaintiff, characterizing the Quality Planning Summit presentation as a significant performance failure.

132. Shortly before Plaintiff's vacation, Goodenough accused Plaintiff of failing to prepare his team, weaponizing issues about which Goodenough had earlier assured Plaintiff not to worry. In response, Plaintiff offered to give the presentation remotely during his vacation, which Goodenough declined.

133. During Plaintiff's absence, Goodenough probed Plaintiff's staff in New York about Plaintiff's leadership style, denigrating Plaintiff's professional character all in an attempt to manufacture evidence to justify terminating Plaintiff's employment, although at least one Project Manager responded with praise and positive feedback.

### *Pretextual Termination*

134. Proving that the writing was indeed on the wall, on January 3, 2025, Goodenough informed Plaintiff during a one-on-one meeting that Plaintiff was "not the right fit" for the position.

135. In response, Plaintiff stated to Goodenough that it was "clear" that he did not want Plaintiff on his team for whatever reason, to which Goodenough responded by nodding his head in agreement.

136. Plaintiff continued by requesting to work in a healthy environment and that he was tired of being treated the way that Goodenough was treating him, thereby engaging in protected activity.

137. Plaintiff requested that Goodenough "bare with" him until he could find another position to transfer to so he could maintain employment; Goodnough replied by stating that "he would do whatever he could to help."

138. But the following week, Goodenough once again retaliated on January 6, 2025, when Centene terminated Plaintiff's employment during a meeting with Goodenough.

139. Following the January 3, 2025 meeting, Goodenough sent an email attempting to justify the termination by citing perceived deficiencies in "strategic vision and sense of urgency."

140. Goodenough's explanation contradicted his August 2024 praise and his earlier July 2024 concerns, reflecting shifting and inconsistent rationales.

141. Plaintiff was never placed on a Performance Improvement Plan before his termination.

142. Plaintiff was never formally disciplined before his termination.

143. Plaintiff's termination affected Plaintiff's career, income, benefits, professional standing, and ability to continue performing work for Centene's New York market.

144. Plaintiff's termination also prevented Plaintiff from continuing to support the New York plan, New York members, New York providers, New York operations, and New York leadership through the quality improvement, customer experience, accreditation, and regulatory work he performed. Plaintiff's termination prevented him from continuing to support the New York plan, New York members, New York providers, New York operations, and New York leadership.

145. As a result of Defendants' discrimination, interference with protected benefits, failure to accommodate, hostile work environment, and retaliation, Plaintiff suffered and continues to suffer severe mental and emotional harm, economic damages, lost wages, lost benefits, and other damages.

## FIRST CLAIM FOR RELIEF AGAINST DEFENDANT CENTENE ONLY
### *(Sexual Orientation Discrimination in Violation of Title VII)*

146. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

147. Defendants, through Goodenough and others, discriminated against Plaintiff on the basis of sex and sexual orientation in violation of Title VII by subjecting him to disparate treatment, a hostile work environment, and adverse employment actions, including reassignment to a different position, increased scrutiny, and termination, all solely due to his sexual orientation as a gay male.

148. Plaintiff, a homosexual male, was qualified for his position, as evidenced by over six years of excellent performance. Defendants subjected Plaintiff to adverse employment actions that were motivated by discriminatory animus, including Goodenough's favoritism toward heterosexual employees and targeting of homosexual employees, including Plaintiff's colleague.

149. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered economic losses, for which he is entitled to an award of monetary damages and other relief.

150. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, anxiety, stress, loss of self-esteem and

22

self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANT CENTENE ONLY
### *(Retaliation in Violation of Title VII)*

151. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

152. Plaintiff engaged in protected activity under Title VII by complaining to Human Resources in late February 2024 about hostile work environment and discrimination, and by forwarding formal complaints from other employees regarding discriminatory treatment.

153. Defendants, through Goodenough and others, retaliated against Plaintiff for engaging in protected activity of requesting medical leave by executing a department reorganization during his medical leave, eliminating his position, reassigning him to a different position upon his return, subjecting him to increased scrutiny, and ultimately terminating his employment on January 6, 2025.

154. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered economic losses, for which he is entitled to an award of monetary damages and other relief.

155. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, for which he is entitled to an award of monetary damages and other relief.

## THIRD CLAIM FOR RELIEF AGAINST DEFENDANT CENTENE ONLY
### *(Disability Discrimination in Violation of the ADA)*

156. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

157. Defendants discriminated against Plaintiff on the basis of his disability (depression and anxiety diagnosed February 14, 2024) in violation of the ADA by subjecting him to adverse employment actions, including reassignment, increased scrutiny, and termination on January 6, 2025, shortly after his return from medical leave.

158. Plaintiff was qualified to perform the essential functions of his position, as evidenced by six years of excellent performance and the August 15, 2024 email stating he was doing an "excellent job."

159. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the ADA, Plaintiff has suffered economic losses and emotional distress, for which he is entitled to an award of monetary damages and other relief.

## FOURTH CLAIM FOR RELIEF AGAINST DEFENDANT CENTENE ONLY
### *(Failure to Accommodate in Violation of the ADA)*

160. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

161. Defendants failed to accommodate Plaintiff's disability in violation of the ADA by forcing his premature return to work on July 1, 2024, despite medical authorization continuing through August 29, 2024, and by failing to engage in a good faith interactive process.

162. As a direct and proximate result of Defendants' unlawful conduct in violation of the ADA, Plaintiff has suffered economic losses and emotional distress, for which he is entitled to an award of monetary damages and other relief.

## FIFTH CLAIM FOR RELIEF AGAINST DEFENDANT CENTENE ONLY
### *(Retaliation in Violation of the ADA)*

163. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

164. Defendants retaliated against Plaintiff for engaging in protected activity under the ADA, including requesting accommodation and taking medical leave, by eliminating his original position during his absence, reassigning him to a different position, and terminating his employment.

165. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the ADA, Plaintiff has suffered economic losses and emotional distress, for which he is entitled to an award of monetary damages and other relief.

## SIXTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### *(Interference in Violation of the FMLA)*

166. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

167. At all relevant times, Plaintiff was an eligible employee under the FMLA, having been employed by Centene for over 12 months and having worked at a location with 50 or more employees within 75 miles.

168. Defendants interfered with Plaintiff's FMLA rights by forcing his premature return to work on July 1, 2024, despite medical authorization through August 29, 2024, and by eliminating his position and reassigning him to a different position during his absence.

169. Goodenough qualifies as Plaintiff's individual employer under the FMLA because he acted directly or indirectly in Centene's interest toward Plaintiff and, under the economic reality of the employment relationship, controlled in whole or in part Plaintiff's FMLA rights, including Plaintiff's leave-related return, reinstatement, working conditions, performance treatment, and termination.

170. Goodenough had the power to recommend, initiate, influence, and/or cause adverse employment action against Plaintiff, including reassignment, performance escalation, discipline, and termination.

171. Goodenough supervised and controlled Plaintiff's work schedules and conditions of employment by directing Plaintiff's work, setting and enforcing performance expectations, assigning and modifying Plaintiff's job duties, controlling Plaintiff's workload, scrutinizing Plaintiff's performance, escalating alleged performance concerns to People Relations, and participating in the process by which Plaintiff was returned from leave into a materially different position.

172. Goodenough contributed to and/or maintained employment records concerning Plaintiff by creating, sending, receiving, and/or causing documentation of alleged performance concerns, Human Resources and People Relations communications, performance-related emails, and termination-related communications.

173. Goodenough controlled Plaintiff's FMLA rights in whole or in part because he knew of Plaintiff's protected leave, communicated with Human Resources and People Relations regarding Plaintiff's absence and alleged performance, participated in the departmental reorganization during Plaintiff's leave, participated in or influenced Plaintiff's forced premature return, controlled Plaintiff's post-leave working conditions, and participated in or influenced Plaintiff's termination.

174. Defendants interfered with Plaintiff's FMLA rights by forcing Plaintiff to return from leave before his treatment team recommended, failing to restore Plaintiff to the same or an equivalent position, placing Plaintiff into a materially different role with new responsibilities and

expectations, undermining Plaintiff's protected return from leave, and terminating Plaintiff after he exercised protected FMLA rights.

175. Defendants' conduct caused Plaintiff to lose FMLA-protected benefits, including the right to take protected leave without interference and the right to return to the same or an equivalent position without retaliation or adverse treatment.

176. Defendants' violations were willful.

177. As a direct and proximate result of Defendants' FMLA interference, Plaintiff suffered damages, including lost wages, lost benefits, emotional distress, liquidated damages, attorneys' fees, costs, and other relief available by law.

## SEVENTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### *(Retaliation in Violation of the FMLA)*

178. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

179. Plaintiff exercised rights protected by the FMLA by requesting and taking medical leave.

180. Goodenough knew Plaintiff exercised FMLA and medical leave rights because Plaintiff notified Goodenough that he had filed a short-term disability claim and would be out of the office while awaiting leave-related instructions.

181. After Plaintiff exercised protected leave rights, Goodenough and Centene reorganized Plaintiff's department, eliminated or substantially changed Plaintiff's prior role, forced Plaintiff to return before his treatment team recommended, reassigned Plaintiff to a materially different position, imposed increased scrutiny and workload, criticized Plaintiff shortly after his return, and terminated Plaintiff.

182. Goodenough personally participated in and/or influenced the retaliatory conduct by escalating alleged performance concerns, communicating with Human Resources and People Relations, participating in and/or implementing the department reorganization, supervising Plaintiff's forced return into a materially different role, criticizing Plaintiff during the protected post-leave transition period, issuing inconsistent performance feedback, telling Plaintiff he was "not the right fit," participating in Plaintiff's termination meeting, and attempting to justify Plaintiff's termination.

183. Goodenough's conduct demonstrates that he controlled, in whole or in part, Plaintiff's rights under the FMLA and acted directly or indirectly in Centene's interest with respect to Plaintiff.

184. Defendants' stated reasons for Plaintiff's termination were pretextual because Plaintiff had a strong performance history, was never placed on a Performance Improvement Plan, was never formally disciplined, received written praise from Goodenough after returning from leave, and was terminated after exercising protected leave and accommodation rights.

185. Defendants' retaliation was willful.

186. As a direct and proximate result of Defendants' FMLA retaliation, Plaintiff suffered damages, including lost wages, lost benefits, emotional distress, liquidated damages, attorneys' fees, costs, and other relief available by law.

### EIGHTH CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Sexual Orientation Discrimination in Violation of the NYSHRL)*

187. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

188. The NYSHRL prohibits discrimination in the terms, conditions, and privileges of employment based on an individual's sexual orientation.

189. As a remote employee who reasonably could have been expected to attend meetings in Defendant Centene's New York offices, travel to New York, and supported the work of patients and clients in New York, Plaintiff was subject to the laws of New York.

190. Plaintiff is a homosexual male who was subjected to discriminatory treatment by Defendants based on his sexual orientation, including disparate treatment, a hostile work environment, reassignment to a different position, and ultimate termination.

191. Defendants' discriminatory conduct had an impact in New York because it affected Plaintiff's New York-centered employment, deprived Plaintiff of the ability to continue performing work for Centene's New York market, and included discriminatory and hostile conduct by Goodenough while Plaintiff was physically present in New York City for work, including reprimands, criticism of Plaintiff's leadership, questioning of Plaintiff's MLTC competence, heightened scrutiny, shifting expectations, and discussion of removing significant responsibilities from Plaintiff's role.

192. While Plaintiff was physically working from New York throughout his employment, Goodenough reprimanded him, criticized his leadership, questioned his MLTC knowledge, imposed heightened presentation scrutiny, and discussed transferring significant responsibilities from Plaintiff's role.

193. Defendants, through Goodenough and others, openly favored and spent more time with heterosexual employees while deliberately excluding Plaintiff and his colleague, both homosexual minorities, subjecting them to relentless criticism and extreme micromanagement while consistently praising heterosexual employees.

194. Goodenough demoted Plaintiff's colleague without providing any coaching or Performance Improvement Plan, demonstrating his pattern of adverse treatment toward homosexual employees, and ultimately terminated Plaintiff on January 6, 2025.

195. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered economic losses, and continues to suffer such losses, for which he is entitled to an award of monetary damages.

196. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, anxiety, stress, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

## NINTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### *(Disability Discrimination in Violation of the NYSHRL)*

197. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

198. The NYSHRL prohibits discrimination in the terms, conditions, and privileges of employment based on an individual's disability.

199. Plaintiff has a disability within the meaning of the NYSHRL, specifically depression and anxiety diagnosed on February 14, 2024, which substantially limits major life activities.

200. Defendants discriminated against Plaintiff in violation of the NYSHRL by forcing his premature return from medical leave on July 1, 2024, despite medical authorization continuing through August 29, 2024, eliminating his position during his absence, reassigning him to a

different position with increased scrutiny, and ultimately terminating his employment on January 6, 2025.

201. Defendants' disability discrimination, failure to accommodate, and failure to engage in cooperative dialogue had an impact in New York City because Plaintiff's role was tied to New York City operations, New York City community-based offices, and Centene's New York market, and because the course of hostility and heightened scrutiny that contributed to Plaintiff's worsening mental health included incidents occurring while Plaintiff was physically working in New York City. Plaintiff provided details regarding incidents that occurred while he was physically in New York for work and that he believed were relevant to the harassment and discriminatory treatment he experienced under Goodenough.

202. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered economic losses, and continues to suffer such losses, for which he is entitled to an award of monetary damages.

203. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, anxiety, stress, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

## TENTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### *(Retaliation in Violation of the NYSHRL)*

204. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

205. Plaintiff engaged in protected activity under the NYSHRL by reporting the pervasive hostility in the workplace to Human Resources in late February 2024 and forwarding

formal complaints from other employees about discriminatory treatment and hostile work environment.

206. Defendants retaliated against Plaintiff for engaging in protected activity by executing a complete departmental reorganization during his medical leave, eliminating his position, reassigning him to a different position upon his return, subjecting him to increased scrutiny and hostile treatment, and ultimately terminating his employment on January 6, 2025.

207. Defendants' retaliation had an impact in New York City because it affected Plaintiff's New York City and New York market work, and because Plaintiff's protected activity arose in part from incidents that occurred while Plaintiff was physically present in New York City for work, including the February 2024 New York State Department of Health PIP meeting, the complaints later filed by Dylan Brown and Javeeria Ghani, and Plaintiff's own escalation of the matter to Corporate Human Resources. The February 2024 incidents occurred while Plaintiff was physically in New York City for work, and Dylan and Javeeria later filed complaints concerning what occurred, which Plaintiff raised with Corporate HR.

208. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered economic losses, and continues to suffer such losses, for which he is entitled to an award of monetary damages.

209. As a direct and proximate result of Defendants' conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, anxiety, stress, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

## ELEVENTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### *(Sexual Orientation Discrimination in Violation of the NYCHRL)*

210. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

211. As a remote employee who reasonably could have been expected to attend meetings in Defendant Centene's New York offices, travel to New York, and supported the work of patients and clients in New York, Plaintiff was subject to the laws of New York.

212. The NYCHRL prohibits discrimination in the terms, conditions, and privileges of employment based on an individual's sexual orientation. Under the NYCHRL, Plaintiff need only show that his sexual orientation was a motivating factor in Defendants' adverse employment actions.

213. The impact of Defendants' discrimination and hostile work environment was felt in New York City because Plaintiff was physically present in New York City for work when Goodenough reprimanded him regarding the New York State Department of Health PIP meeting, criticized Plaintiff's leadership, questioned Plaintiff's MLTC subject-matter expertise, subjected Plaintiff to heightened scrutiny and shifting expectations, and discussed transferring significant NCQA Accreditation and State Regulatory Reporting responsibilities away from Plaintiff.

214. Plaintiff was physically in New York City for work when several of the directly hostile and discriminatory incidents occurred, including the February 2024 incidents, Goodenough's reprimand, MLTC criticism, heightened scrutiny, shifting expectations, and discussion of removing significant responsibilities.

215. Defendants, through Goodenough and others, discriminated against Plaintiff in violation of the NYCHRL by subjecting Plaintiff to disparate treatment and a hostile work environment due to his sexual orientation, including openly favoring heterosexual employees,

33

targeting Plaintiff and his homosexual colleague for adverse treatment, and ultimately terminating his employment on January 6, 2025.

216. As a direct and proximate result of Defendants' conduct in violation of the NYCHRL, Plaintiff has suffered economic losses, and continues to suffer such losses, for which he is entitled to an award of monetary damages.

217. As a direct and proximate result of Defendants' conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, anxiety, stress, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

## TWELFTH CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Disability Discrimination and Failure to Engage in Cooperative Dialogue in Violation of the NYCHRL)*

218. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

219. The NYCHRL prohibits discrimination in the terms, conditions, and privileges of employment based on an individual's disability. The NYCHRL must be construed liberally to accomplish its uniquely broad remedial purposes.

220. The NYCHRL also requires employers to engage in a good faith cooperative dialogue when they know or have reason to believe that an employee is suffering from a disability, accommodating that disability unless doing so creates an undue burden or if the employee is unable to perform the essential functions of his job with an accommodation.

221. Defendants, through Goodenough and others, discriminated against Plaintiff in violation of the NYCHRL by subjecting Plaintiff to a hostile work environment due to his mental

health disability, forcing his premature return from medical leave, failing to engage in good faith accommodation discussions, eliminating his position during his absence, reassigning him to a different position, denying his accommodation request of a ramp-up period upon his return, and ultimately terminating his employment on January 6, 2025.

222. As a direct and proximate result of Defendants' conduct in violation of the NYCHRL, Plaintiff has suffered economic losses, and continues to suffer such losses, for which he is entitled to an award of monetary damages.

223. As a direct and proximate result of Defendants' conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, anxiety, stress, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

### THIRTEENTH CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Retaliation in Violation of the NYCHRL)*

224. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

225. The NYCHRL prohibits employers from retaliating against employees who engage in activity protected by the NYCHRL. Under the NYCHRL, Plaintiff need only show that his protected activity was a motivating factor in Defendants' adverse actions.

226. Plaintiff engaged in protected activity under the NYCHRL by reporting pervasive hostility and discrimination in the workplace to Human Resources in late February 2024, forwarding formal complaints from other employees about discriminatory treatment, and requesting reasonable accommodations for his disability.

227. Defendants retaliated against Plaintiff for engaging in protected activity by executing a complete departmental reorganization during his medical leave, eliminating his position, reassigning him to a different position upon his return, subjecting him to increased scrutiny and hostile treatment, and ultimately terminating his employment on January 6, 2025.

228. Defendants' retaliation had an impact in New York City because it affected Plaintiff's New York City and New York market work, and because Plaintiff's protected activity arose in part from incidents that occurred while Plaintiff was physically present in New York City for work, including the February 2024 New York State Department of Health PIP meeting, the complaints later filed by Dylan Brown and Javeeria Ghani, and Plaintiff's own escalation of the matter to Corporate Human Resources. The February 2024 incidents occurred while Plaintiff was physically in New York City for work, and Dylan and Javeeria later filed complaints concerning what occurred, which Plaintiff raised with Corporate HR.

229. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered economic losses, and continues to suffer such losses, for which he is entitled to an award of monetary damages.

230. As a direct and proximate result of Defendants' conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, anxiety, stress, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

## JURY DEMAND

231. Pursuant to FRCP 38, Plaintiff hereby demands a trial by jury on all issues of fact and damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a.      A judgment declaring that the practices complained of herein are unlawful and in violation of the aforementioned United States and New York State and City laws;

b.      Preliminary and permanent injunctions against Defendants and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

c.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including lost wages, front pay in lieu of reinstatement, lost health and retirement benefits, and other pecuniary harm;

d.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering, and ongoing medical treatment costs, and any other physical or mental injuries;

e.      An award of punitive damages;

f.      An award of liquidated damages pursuant to the FMLA;

g.      An award of pre-judgment and post-judgment interest;

h.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

i.      Such other and further relief as the Court may deem just and proper.

Dated:  Deer Park, New York
        July 30, 2026

                                        Respectfully submitted,

                                        **STEVENSON MARINO LLP**

                            By:  _____
                                        MICHAEL R. MINKOFF, ESQ.
                                        2000 Deer Park Avenue
                                        Deer Park, NY 11729
                                        *Attorneys for Plaintiff*